| | | |
|---|---|---|
| ADAM B. HARMON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 4:12-CV-10-PRC |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Adam B. Harmon on February 22, 2012, and a Plaintiff's Brief [DE 23], filed by Mr. Harmon on October 17, 2012. Mr. Harmon requests that the November 23, 2010 decision of the Administrative Law Judge denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") be reversed or remanded for further proceedings. On November 20, 2012, the Commissioner filed a response, and Mr. Harmon filed a reply on February 1, 2013. For the following reasons, the Court denies Mr. Harmon's request for remand.

## PROCEDURAL BACKGROUND

On August 8, 2007 and August 28, 2007, respectively, Mr. Harmon filed applications for DIB and SSI, alleging an onset date of January 5, 2007. The applications were denied initially on November 1, 2007, and upon reconsideration on April 9, 2008. Mr. Harmon timely requested a hearing, which was held on June 7, 2010, before Administrative Law Judge ("ALJ") Albert J. Velasquez. In appearance were Mr. Harmon, his attorney C. David Little, his mother Vicky Harmon, and vocational expert ("VE") Robert Barber. The ALJ issued a written decision denying benefits on November 23, 2010. He made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.      The claimant has not engaged in substantial gainful activity since January 5, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.      The claimant has the following severe impairments: degenerative disc disease, late effects of right[1] shoulder injury, osteoporosis, epilepsy and social anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) provided the work allows the claimant to alternate to a sitting or standing position for 1-2 minutes every hour. Moreover, he is unable to climb ladders, ropes or scaffolds with no more than occasional climbing of stairs or ramps. He is unable to crawl or kneel. He is to have no rapid head or neck movement or overhead work. He should avoid work around unprotected heights, dangerous moving machinery, and should avoid operating a motor vehicle. He should avoid work around open flames or large bodies of water and should not require work at extremes of temperature or humidity. The work should not require more than superficial interaction with the general public, co-workers, or supervisors.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born [in 1977] and was 29 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 FR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a

---

[1] Mr. Harmon suffers from a left shoulder injury; elsewhere in the decision, the ALJ acknowledges a left shoulder injury.

finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 405, 1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from January 5, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

AR 13-21.

On December 28, 2011, the Appeals Council denied Mr. Harmon's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. Mr. Harmon filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTS

### A. Medical Background

At the time of the hearing, Mr. Harmon was 33 years old with a high school education and some vocational training through General Motors. He has worked as an automobile mechanic.

Mr. Harmon has a history of epilepsy, first diagnosed in December of 1993, for which he was prescribed Tegretol.

On July 29, 2001, Mr. Harmon was in a roll-over motor vehicle accident when a tire blew out and he was ejected from his vehicle; he injured his back. Mr. Harmon was treated by Joseph Koscielniak Jr., M.D. at St. Anthony Medical Center for back injuries suffered in the accident; a CT scan and an x-ray revealed an acute compression fracture of the L1 vertebral body.

Mr. Harmon's last grand mal seizure occurred in 2004 or 2005, when he had a seizure in the shower and hooked his left arm on the shower door, resulting in injury to his shoulder and limited range of motion in his shoulder. Mr. Harmon's mother testified that they believe that the seizure was caused by a fluorescent light in the shower, which is now left turned off when he takes a shower.

At an October 11, 2005 visit, Mr. Harmon told Dr. Cristea, his treating physician, that he had not been sleeping well and that he was having trouble working with his arms above his head because that caused neck pain. A November 15, 2005 MRI of the cervical spine revealed multilevel degenerative changes with multilevel degenerative disc disease and loss of normal T2 signal and generalized disc bulging. On April 4, 2006, Mr. Harmon told Dr. Cristea that he was having trouble sitting still, that his limbs would often fall asleep, and that in one instance he experienced right arm and leg paralysis for about five minutes. Mr. Harmon complained of hand pain when doing overhead work. Dr. Cristea diagnosed epilepsy, osteoporosis, pain syndrome with degenerative disc disease, and social anxiety disorder.

Mr. Harmon testified that his doctor said that he has Raynaud's disease, which he said causes his blood to be pulled to the core instead of his extremities, resulting in cold hands and feet. He explained that the cold makes his hands stiff and complicates his osteoarthritis, interfering with his ability to use his hands.

On April 4, 2006, Chirag Patel, M.D. conducted an internal medical consultation following a request from Dr. Cristea. He indicated in his report that he spent an "extensive amount of time" with Mr. Harmon in reference to his internal medicine needs, including chart review. Dr. Patel found Mr. Harmon to be alert and in no apparent distress, resting comfortably in the chair. His impressions were osteoporosis, claudication by history, hypercholesterolemia, chronic fatigue, cold intolerance, and epilepsy. As for the chronic fatigue, Dr. Patel opined that it could be multifactorial, stemming from sleep issues or thyroid issues.

Mr. Harmon testified that he still gets run down easily because he does everything the hard way because he compensates for his back problems. In addition, he does not get much sleep due to an uncomfortable mattress.

Dr. Cristea's treatment notes for June 6, 2006, indicate a report of no epileptic spells, no changes on examination, and diagnoses of epilepsy, osteoporosis, left upper extremity compression fracture, pain syndrome with degenerative disc disease, and social anxiety disorder.

Progress notes for November 21, 2006, indicate that Mr. Harmon "feels okay" and had no shortness of breath or chest pain. Dr. Cristea's treatment notes indicate no change on examination and list diagnoses of epilepsy, osteoporosis, left upper extremity compression fracture, pain syndrome with degenerative disc disease, social anxiety disorder.

Progress notes for December 4, 2006, indicate that Mr. Harmon reported feeling less tired with his thyroid medication, although he still feels cold.

On September 25, 2007, Dr. Cristea wrote in his treatment notes that Mr. Harmon complained of neck, left shoulder, and back pain that is getting worse. Mr. Harmon reported that he

could not work due to pain. Dr. Cristea wrote the notation, "he's disabled." (AR 456). Dr. Cristea found no changes upon examination.

J. Smejkal, M.D. examined Harmon on behalf of the Disability Determination Bureau on September 26, 2007, but did not review any of Mr. Harmon's medical records. Mr. Harmon informed Dr. Smejkal of the 2001 motor vehicle accident and gave a thorough history of his complaints, including epilepsy, degenerative disc disease of the cervical spine, osteoporosis, social anxiety, underactive thyroid, poor circulation in his hand and coldness in his hands, and chronic fatigue. On examination, Dr. Smejkal found no abnormalities other than paraspinal tenderness in the cervical spine with mildly restricted range of motion and pain and stiffness in the left shoulder with restricted range of motion. Dr. Smejkal noted that Mr. Harmon was cooperative and not in any acute respiratory or painful distress; he appeared comfortable in the seated and supine positions; and his memory for recent and remote events was preserved; and his intellectual function was grossly normal. He found the spine to be normal with normal curvature in the cervical, thoracic, and lumbar spine with no kyphosis, scoliosis, or anatomical deformities. He found full range of motion in the upper extremities with the exception of the left shoulder. Mr. Harmon had normal pulses, sensations, and strength in the upper extremities. The findings in the lower extremities were all normal. Dr. Smejkal noted a normal gait and the ability to walk heel to toe and tandemly, to squat and stoop, and to get on and off the exam table without difficulty. The neurological exam was normal.

Dr. Cristea referred Mr. Harmon to an orthopaedic surgeon, Harry A. Moffit, D.O., for his complaints of left shoulder pain. On October 8, 2007, after conducting a physical exam, history, and review of an MRI, Dr. Moffit diagnosed Harmon with derangement of the left shoulder secondary to a labral tear and recommended left shoulder arthroscopy. Mr. Harmon testified that he cannot

afford the surgery and Medicaid will not pay for it. On October 21, 2007, Dr. Moffitt wrote Dr. Cristea a letter summarizing his examination and recommendation.

An October 24, 2007 RFC assessment performed by B. Whitley, M.D. for the State Agency, which was conducted without the benefit of a treating physician's statement regarding Harmon's physical capacities, found that the Claimant could occasionally lift and carry up to 20 pounds and frequently carry up to 10 pounds; stand and/or walk with normal breaks for about six hours in an eight-hour workday; sit with normal breaks for a total of about six hours in an eight-hour workday; engage in only limited pushing or pulling due to limitations in the range of motion for his left shoulder; frequently climb ramps or stairs, but never climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, or crawl; engage in only limited reaching, but engage in unlimited handling, fingering, and feeling; and work with unlimited environmental limitations, except for exposure to machinery and heights due to Harmon's epilepsy. Dr. Whitley opined that Harmon was only partially credible because his allegations were out of proportion to the objective medical examination.

At an October 25, 2007 appointment with Dr. Cristea, Mr. Harmon reported that lower back pain is still an issue. On January 15, 2008, Dr. Cristea noted Mr. Harmon's report that he has trouble with activities of daily living due to pain in his lower back and shoulder. Dr. Cristea found no change on exam. Dr. Cristea wrote, "He's disabled." (AR 447). At a visit on April 29, 2008, Dr. Cristea reviewed the chart and examined Mr. Harmon. No changes were noted on examination. Mr. Harmon "felt okay" but his lower back pain remained. (AR 446). Mr. Harmon reported that he cannot get a job due to epilepsy and due to back problems. On August 12, 2008, Dr. Cristea wrote in his treatment note, "not working," "feeling depressed," "nothing new," "back/neck 'still an

issue,'" "meds renewed," "exam/no change or exam," "he's disabled," "long discussion with patient about diagnoses and future plans." (AR 445).

A February 17, 2009 treatment note from Dr. Cristea provides that Mr. Harmon was "not working due to severe lower back pain" and that otherwise there was no other history or change in his symptoms. (AR 441). Dr. Cristea wrote, "He's disabled." *Id*. Dr. Cristea's notes from an August 17, 2009 visit provide that Mr. Harmon was "working on getting disability," "no seizures," "still with severe lower back pain unable to work." (AR 440). On exam, Dr. Cristea noted that Mr. Harmon had an antalgic gait and that there were no changes from the previous exam. On February 17, 2010, the notes regarding Mr. Harmon's reports include "severe lower back pain & unable to work disabled." (AR 492). Dr. Cristea indicated that Mr. Harmon needed pain management for left shoulder discomfort and lower back pain, but that he could not afford treatment. That same date, Dr. Cristea restarted Harmon on Zoloft due to a depressed mood. On August 17, 2010, Mr. Harmon complained to Dr. Cristea of increased lower back pain, increased muscle spasm in his neck, neck soreness for two months, and increased hand pain. On examination, Dr. Cristea noted decreased range of motion in the neck and back.

### B. Plaintiff's Testimony

Mr. Harmon testified that, although his employer kept him on after the car accident, the back injuries he suffered in the accident worsened over time, he was able to do less and less as an automobile mechanic, he was given fewer hours to work, and he ultimately lost his employment and trained his replacement. Due to his back injury, he was unable to lie on his back to do repairs under the dashboard. He was unable to do work on the hoist because when he looked up his neck would lock, and when he turned or twisted, his back would pinch him and he would drop things. Mr.

Harmon testified that he last worked at Town and City Motors in Gary in July 2007; he worked for only six days because he was physically unable to perform the job.

Mr. Harmon testified that he lived with his parents because he feels uncomfortable being all by himself. He testified that he has been prescribed medication, but he takes it only when he is in absolute agony or just before he goes to bed because it makes him feel like he has a head rush all the time, he does not want to cause injury to others, and he does not want to get hooked on anything.

Mr. Harmon testified that he is unable to look up without causing a muscle spasm in his neck, which lasts about a week. He also suffers pain when he looks all the way down. Because of his neck pain, he rarely uses the computer. He cannot play computer games because they can last an hour or more, and he cannot sit that long. He has pain in his neck about 25 out of 30 days. He testified that the pain feels like someone has stuck a knife in his neck, and it takes about six or seven days after the onset of pain for him to resume exercises he is supposed to do to help his neck. Mr. Harmon stated that he has back pain about 99% of the time. At the time of the hearing, he rated his back pain as seven to ten and his neck pain as about a five. Mr. Harmon also testified that he suffers pain in his hips due to osteoporosis, but that pain is a one or two on a scale of ten and the back and neck pain are his primary concerns. Due to his pain, Mr. Harmon testified that he can sit for only 20-25 minutes before changing positions and starts to squirm after 10 to 15 minutes. Leaning against something or walking around helps get rid of the numbness he feels in his right buttock after sitting. The numbness occurs at about L1-L2 and progresses down his right leg to the bottom of his back pants pocket with a tingling feeling. Mr. Harmon testified that he can only stand straight for about five minutes before needing to lean on something. He leans on the shopping cart as he walks around the store.

Harmon testified that he continues to suffer from petit mal seizures, which last about 10 minutes, but he is able to work through them. He is sensitive to flickering lights, such as those on a computer monitor. His small seizures are preceded by an aura in the form of a high-pitched squeal, like a camera flash lighting up, so he is able to prepare for them. He has not had a seizure that was required to be reported to the Bureau of Motor Vehicles in the six months prior to the hearing and was able to a maintain a driver's license.

Mr. Harmon testified that he does not believe he could maintain the stamina to work for eight hours per day, working at intervals of at least two hours with two 15-minute breaks and a lunch break because he cannot sit still and has to get up and move around. He was rejected for a job at a gas station because he could not lift a 40-pound bag of salt. He can lift about 10 pounds regularly, but he has dropped a gallon of milk because of the weight of the container pulling on him. He can stand or lean for about 15 or 20 minutes before sitting down to rest. Changing positions does not relieve the pain as much as it shifts the pain. Mr. Harmon prefers to sit in a recliner rather than in a straight back chair, because he does not have to keep his neck straight, and the angle of the chair prevents extra weight from being placed upon him.

In addition to applying for a job at a gas station, Mr. Harmon tried an online job, but that did not work out. He also signed up to be a Secret Shopper, but ended up being defrauded and having his debit card stolen. He also attempted to sell an environmentally safe fuel treatment intended to boost mileage, but he could not afford the shipping costs and ended up selling the products he purchased to friends and family.

Mr. Harmon testified that anxiety makes it difficult for him to leave his house. He testified that he was anxious to be at the hearing and that his hands were numb because he was not breathing properly.

### C. Vicky Harmon's Testimony

Vicky Harmon, Mr. Harmon's mother, testified that the Tegretol causes osteoporosis, which means that Mr. Harmon loses calcium in his bones and must take calcium supplements. She testified that, in addition to Mr. Harmon's inability to sit or stand for any length of time, he just does not know how to communicate with people, and other people find him annoying. She tesitfied that he is constantly changing positions, cracking and popping his back, and shifting his weight, in an effort to alleviate his pain. She testified that Mr. Harmon suffers from an anxiety disorder for which he takes Zoloft.

### D. VE Testimony

The VE classified Mr. Harmon's past work as an auto mechanic as medium, skilled and as a stock clerk as heavy, semiskilled. The ALJ gave the VE the following hypothetical:

> Let's assume a hypothetical person the claimant's age, education, and work experience; is able to lift and carry 20 pounds occasionally, 10 pounds frequently; can stand and walk for about six of eight hours; sit for about six of eight hours provided the work allows the individual to alternate into a sitting or standing position at their option[] for one or two minutes every hour and provided the work requires no climbing of ropes, ladders, or scaffolds; no more than—additional[sic], no more than occasional climbing of stairs or ramps; no crawling or kneeling; no rapid head or neck movement; no work—no overhead work; the individual should avoid working in unprotected heights, around dangerous moving machinery, operating a motor vehicle or working around open flames, or large bodies of water; and the work should not require work at extremes of temperature or humidity; the work should not require more than superficial interaction with the general public, coworkers, or supervisors; and to the extent that there's any conflict in your opinion in the same information that might appear in the DOT or the SOC, please explain the conflict and how you resolved it.

(AR 88). The VE responded that the following jobs fit the ALJ's criteria: packing line worker, light, unskilled, SVP of 2, 2,910 jobs in Indiana; information clerk, light, unskilled, SVP of 2, 1,430 jobs in Indiana; cashier, light, unskilled, SVP of 2, 22,350 jobs in Indiana. According to the VE, a cashier's interaction with the public is only superficial.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*,

381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that, as a reviewing court, we may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

### DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from

doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's RFC, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC"). The RFC "is an administrative assessment of what work-related activities an individual can perform despite [her] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of

proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Mr. Harmon seeks reversal and remand of the ALJ's finding of not disabled on the basis that (1) the ALJ failed to give proper weight to the opinions of his treating physician; (2) the ALJ erred in the credibility determination; (3) the ALJ failed to consider the entirety of all of Mr. Harmon's impairments as a whole or in combination at steps three and five of the sequential analysis; and (4) the ALJ failed to pose an adequate hypothetical to the VE. The Court considers each in turn.

### A. Weight to Treating Physician

First, Mr. Harmon argues that the ALJ failed to accord substantial deference to the opinions and diagnoses of Dr. Cristea, Mr. Harmon's treating physician. An ALJ must give the medical opinion of a treating doctor controlling weight as long as the

> treating source's opinion on the issue(s) of the *nature and severity* of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record . . . . When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons . . . for the weight we give to your treating source's opinion.

20 C.F.R. § 404.1527(c)(2) (emphasis added); 20 C.F.R. § 416.927(c)(2); *see also Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); SSR 96-8p, 1996 WL 374184 (Jul.2 1996); SSR 96-2p, 1996 WL 374188 (Jul. 2, 1996). In other words, the ALJ must give a treating physician's opinion controlling weight if (1) the opinion is supported by "medically acceptable clinical and laboratory

diagnostic techniques" and (2) it is "not inconsistent" with substantial evidence of record." *Schaaf*, 602 F.3d at 875.

The referenced factors listed in paragraphs (c)(2) through (c)(6) are the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and other factors such as the familiarity of a medical source with the case. 20 C.F.R. §§ 404.1527(c), 416.927(c). "[I]f the treating source's opinion passes muster under [§ 404.1527(c)(2)], then there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it." *Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011) (internal quotation marks omitted) (quoting *Hofslien*, 439 F.3d at 376). Courts have acknowledged that a treating physician is likely to develop a rapport with his or her patient and may be more likely to assist that patient in obtaining benefits. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). An ALJ is entitled to discount the medical opinion of a treating physician if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as the ALJ gives a good reason. *Schaaf*, 602 F.3d at 875; *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).

In this case, Dr. Cristea, Mr. Harmon's treating physician, did not fill out a physical residual functional capacity form. Rather, Dr. Cristea made a notation that Mr. Harmon is "disabled" in his routine treatment notes on September 25, 2007, January 15, 2008, August 12, 2008, February 17, 2009, and February 17, 2010, and that Mr. Harmon is "unable to work" due to severe lower back pain in his treatment notes from August 17, 2009.[2] After the ALJ noted these statements of

---

[2] Although it appears that the ALJ read these notations in the treatment record to mean that Dr. Cristea found Mr. Harmon to be "disabled," a review of the notes appears to make it equally likely that Dr. Cristea was reporting a statement by Mr. Harmon that Mr. Harmon himself reported being disabled.

"disability" as well as Dr. Cristea limiting Mr. Harmon to lifting no more than 15 pounds, the ALJ gave Dr. Cristea's notations of "disability" "little" weight for three reasons. First, the ALJ noted that the determination of whether an individual is "disabled" or "unable to work" is an administrative finding reserved to the Commissioner. He noted that medical opinions on these issues must not be disregarded but that they are not entitled to controlling weight or given any special deference, even when offered by a treating source. *See* (AR 20) (citing SSR 96-5p). Second, the ALJ found that Dr. Cristea did not base this opinion on a physical examination. Third, the ALJ found this opinion inconsistent with the record as a whole. Mr. Harmon acknowledges only the first two reasons.

As to the first, Mr. Harmon argues that the ALJ's opinion should have been given controlling weight under 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), and SSR 96-2p. However, Mr. Harmon's analysis under this authority is misplaced as the ALJ was not weighing an opinion of Dr. Cristea as to the "nature and severity" of Mr. Harmon's physical impairments but rather was assessing Dr. Cristea's findings of "disabled" and "unable to work." Mr. Harmon's contrary assertion in his brief that Dr. Cristea "was not offering an opinion on the ultimate issue of legal disability, but rather on the 'nature and severity of [Harmon's] imparment(s)" is simply unsupported by the record. Pl. Br., p. 19 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)).[3]

As indicated by the ALJ, Dr. Cristea's opinion on this "ultimate issue" of disability is not entitled to controlling weight or any special significance. SSR 96-5p, 1996 WL 374183, at *2 (Jul.

---

[3] The facts in *Green-Younger*, a case from the Second Circuit Court of Appeals, do not support Mr. Harmon's position either. In that case, the treating physician did not give an opinion of "disabled" but in fact gave an opinion on the "nature and severity" of the plaintiff's impairments. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). The court found that "[h]e opined that 'her ability to function at a normal level because of the persistent, severe pain is markedly limited,' noting specifically that she could not sit or stand for more than four hours a day, that she could not continuously sit or stand for 60 minutes without a rest period, and that it was difficult for her to sit for more than 30 minutes at a time." *Id.* at 106-07. Mr. Harmon does not identify any similar opinion by Dr. Cristea as to the nature and severity of his impairments.

2, 1996). SSR 96-5p provides that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including "[w]hether an individual is 'disabled' under the Act." *Id*. Thus, contrary to Mr. Harmon's contention, the ALJ gave proper weight to Dr. Cristea's notation of "disability." Moreover, the ALJ fully complied with the requirements of SSR 96-5p by evaluating this evidence notwithstanding it being an opinion on an issue reserved to the Commissioner and by explaining the consideration he gave to Dr. Cristea's opinion, including whether the opinion is supported by the record as whole. *See* SSR 96-5p, 1996 WL 374183, at *3.

To the extent the ALJ's second reason—that "Dr. Cristea did not base this opinion on a physical examination," (AR 20) —literally means that Dr. Cristea did not examine Mr. Harmon, the Court agrees with Mr. Harmon that this is a misstatement of the record. Dr. Cristea routinely examined Mr. Harmon for many years as set out in the background above and as set forth in detail by the ALJ in his decision on pages 17-19. The fact that the ALJ thoroughly discussed Dr. Cristea's treatment records begs the question of whether what he really meant by the statement that "Dr. Cristea did not base this opinion on a physical examination" is that the statement of "disabled" is not *supported* by the physical examinations Dr. Cristea conducted.

In a similar vein, Mr. Harmon is incorrect in his reply brief when he contends that the Commissioner stated in her response brief that "Dr. Cristea *did not undertake any significant physical examinations* of . . . Mr. Harmon, to determine that opinion of disability and agree[s] with the ALJ that Dr. Cristea's opinion was invalid because it was *not based upon a physical examination* of [Mr. Harmon]." Pl. Reply, p.1 (citing Commissioner's Response p.7)(emphasis added). This is

a misstatement by Mr. Harmon of the Commissioner's brief. Rather, the Commissioner correctly points out that, consistent with the ALJ's finding, in his examination findings Dr. Cristea "did not document any *significant physical examination findings* to support his opinion of total disability." Def. Br., p. 7 (emphasis added) (citing AR 360-61, 364, 428-29, 441, 445, 447, 456, 490, 492, 498).

To the extent that the ALJ's statement that "Dr. Cristea did not base this opinion on a physical examination" was an error, the error is harmless in light of the third reason offered by the ALJ for giving "little weight" to Dr. Cristea's opinion, which is that the statement of "disabled" "is inconsistent with the record as a whole." (AR 20). Mr. Harmon fails to acknowledge this third and critical reason. Mr. Harmon is also incorrect when he asserts that "[t]he ALJ has conveniently ignored a 10-year medical history of frequent medical examinations and chosen to single out a solo statement by Dr. Cristea that Harmon is disabled." Pl. Br., p. 18. The ALJ thoroughly described in his decision the length of that treatment history with Dr. Cristea, detailing each visit beginning in 2006 and Dr. Cristea's findings at the visits. It was these treatment notes, along with the thorough discussion of the other medical evidence of record, that ultimately led to his decision to give "little" weight to Dr. Cristea's opinion on the ultimate issue of disability. *See* (AR 17-19). Mr. Harmon does not identify a single treatment record that the ALJ did not consider.

Although Mr. Harmon cites generally to the treatment records in his opening brief and more specifically to treatment records in the analysis of his reply brief, he does not identify any specific findings to rebut the RFC assigned by the ALJ or that would support a finding of total disability. While he is correct that Dr. Cristea likely frequently examined him consistent with what a lay person would consider a regular office visit examination, Dr. Cristea did not include any description of those examinations or any functional limitations flowing therefrom in his treatment notes.

In contrast, the consultative examination performed by Dr. Smejkal in September 2007 was entirely normal other than reduced range of motion in the left shoulder with stiffness and paraspinal tenderness in the cervical spine with mildly restricted range of motion and pain. Dr. Smejkal noted that Mr. Harmon was alert and in no apparent distress; appeared comfortable while sitting and laying down; had a normal gait and was able to squat, stoop, and move about without difficulty; had full range of motion in all joints except his left shoulder; had excellent strength and muscle tone; and had normal sensation and reflexes. Dr. Smejkal did not review medical records, but he was aware of the 2001 motor vehicle accident as reported by Mr. Harmon. The October 2007 examination by Dr. Moffitt was also negative other than reduced range of motion. Because of Mr. Harmon's testimony and the findings of these examinations, the ALJ accounted for Mr. Harmon's shoulder problems by limiting him to work that did not require overhead reaching and required him to lift no more than 20 pounds occasionally and ten pounds more frequently.

To the extent Mr. Harmon may be arguing that the ALJ gave improper weight to Dr. Smejkal, he makes no such explicit argument and the evidence of record supports the weight assigned. Mr. Harmon suggests that Dr. Smejkal's opinion is based only his discussion with Mr. Harmon, but, as just described, Dr. Smejkal completed a full physical evaluation and documented his findings. These findings are not inconsistent with the other medical evidence of record, including the findings in Dr. Cristea's reports (other than the notation of "disabled") and the objective medical evidence. Thus, the Court finds that the ALJ's decision to give Dr. Cristea's statements of

"disability" and "unable to work" "little" weight was not a legal error and is supported by substantial evidence.[4]

## B. Credibility Determination

Next, Mr. Harmon contends that the ALJ failed to make the requisite findings in support of his credibility determination. In making a disability determination, Social Security Regulations provide that the Commissioner must consider a claimant's statements about his symptoms, such as pain, and how the claimant's symptoms affect his daily life and ability to work. *See* 20 C.F.R. §§ 404.1529(a); 416.929(a). However, subjective allegations of disabling symptoms alone cannot support a finding of disability. *See id.* In determining whether statements of pain contribute to a finding of disability, the Regulations set forth a two-part test: (1) the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the alleged symptoms; and (2) once an ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms. *Id.*

The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)    The individual's daily activities;
(2)    Location, duration, frequency, and intensity of pain or other symptoms;
(3)    Precipitating and aggravating factors;
(4)    Type, dosage, effectiveness, and side effects of any medication;

---

[4] Mr. Harmon cites the January 31, 2011 report of clinical electrophysiologist Julian Ungar-Sargon, M.D., Ph.D.'s impression following EMG testing of was "CTS [carpal tunnel syndrome] left side." (AR 521). He also cites the January 24, 2011 EMG testing by Dr. Ungar-Sargon that revealed "acute and chronic changes in lower limbs muscles with slowing of motor components." (R. 524). First, Mr. Harmon suggests that these reports from 2011 could some how have informed Dr. Cristea's notations of "he's disabled" in 2008 and 2009; this is impossible. Second, this evidence post-dates the ALJ's November 2010 decision by two months; Mr. Harmon makes no argument for remand based on new evidence.

(5)      Treatment, other than medication, for relief of pain or other symptoms;

(6)      Other measures taken to relieve pain or other symptoms;

(7)      Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). In making a credibility determination, Social Security Ruling 96-7p provides that the ALJ must consider the record as a whole, including objective medical evidence, the claimant's statement about symptoms, any statements or other information provided by treating or examining physicians and other persons about the conditions and how the conditions affect the claimant, and any other relevant evidence. *See* SSR 96-7p, 1996 WL 374186 (Jul. 2, 1996); *see also* §§ 404.1529(c)(1); 416.929(c)(1).

An ALJ is not required to give full credit to every statement of pain made by the claimant or to find a disability each time a claimant states he is unable to work. *See Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996). However, Ruling 96-7p provides that a claimant's statements regarding symptoms or the effect of symptoms on his ability to work "may not be disregarded solely because they are not substantiated by objective evidence." SSR 96-7p at *6. "Because the ALJ is 'in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (quoting *Skarbek*, 390 F.3d at 504-05); *see also Prochaska*, 454 F.3d at 738. Nevertheless, "an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record." *Pepper v. Colvin,* 712 F.3d 351, 367 (7th Cir. 2013) (citing *Terry v. Astrue,* 580 F.3d 471, 477 (7th Cir. 2009)).

In this case, after his detailed recitation of Mr. Harmon's allegations but before the credibility determination, the ALJ used the transitional paragraph that has come to be known as "meaningless boilerplate," *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012):

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(AR 17). Nevertheless, an ALJ's use of this template does not amount to reversible error if he "otherwise points to information that justifies his credibility determination." *See Pepper*, 712 F.3d at 367-68. In other words, the use of the template does not warrant remand when the ALJ gives other reasons, grounded in evidence, to explain his credibility determination. *See Filus v. Astrue,* 694 F.3d 863, 868 (7th Cir. 2012). In this case, the ALJ did so.

In the sentence following the "boilerplate," the ALJ wrote, "In making this finding, I have considered additional factors that can contribute to a claimant's credibility. They include, but are not limited to, the claimant's work history, treatment-seeking history, diagnostic test results, clinical observations and activities of daily living." *Id*. The ALJ then discussed the evidence in each of these categories in detail over three pages. The ALJ discussed the medical history of Mr. Harmon's epilepsy and that it is controlled with prescribed medication. The ALJ then reviewed the medical evidence of Mr. Harmon's back injury as a result of the car accident in 2001, including the 2001 CT scan, the 2005 MRI, and the 2005 nerve conduction studies.

As mentioned previously, the ALJ meticulously and chronologically summarized the treatment records of Dr. Cristea and all of his findings regarding Mr. Harmon's cold hands, chronic fatigue, claudication, osteoporosis, and thyroid disease, as well as Mr. Harmon's reports to Dr. Cristea in June and November 2006 that he was "feeling okay." The ALJ noted that, in January 2007, Mr. Harmon lost his job, was on unemployment, and filed for disability. He then noted that in September 2007, Mr. Harmon complained of neck, back, and left shoulder pain, stating that he

could not work due to pain. The ALJ continued with a review of treatment records from Dr. Cristea in 2008 and 2009, including Mr. Harmon's repeated reports of back pain and that he was not working due to severe back pain.

The ALJ discussed in detail the largely unremarkable findings of Dr. Smejkal, the consultative examiner, who examined Mr. Harmon on September 26, 2007. The ALJ noted Dr. Smejkal findings of a normal spine and spinal curvature, spinious and paraspinal tenderness in cervical spine with mildly restricted range of motion, full range of motion in the thoracic and lumbar spines, negative straight leg raises, pain and stiffness in the left shoulder with restricted range of motion, full range of motion in all other upper extremities, full strength in all major muscle groups in upper and lower extremities, normal gait, the ability to walk heel to toe and tandemly without difficulty, the ability to stoop and squat without difficulty, and normal grip strength. He noted that Mr. Harmon reported to Dr. Smejkal that he had not had a seizure in three years and that he had been treated for social anxiety but that he could not afford the medication.

The ALJ noted the positive MRI findings as well as the physical examination findings of Dr. Moffitt regarding Mr. Harmon's left shoulder injury, including Dr. Moffitt's diagnosis of derangement of the left shoulder secondary to a labral tear and recommendation of left shoulder arthroscopic surgery.

The ALJ then considered Mr. Harmon's use of medication to treat his pain, recognizing that Mr. Harmon takes his medication as prescribed but that he does not take pain medication when driving or in public because of the side effects that make him feel like he is having a "head rush." (AR 19). The ALJ also recognized that Mr. Harmon does neck exercises to ease neck pain and the use of a recliner for relief of back pain.

As for activities of daily living, the ALJ found that Mr. Harmon can function within the limits of the RFC, noting that Mr. Harmon "can mow the lawn, work on cars, grocery shop, take care of his pets, do some house chores, which suggests he has the capacity for at least light work." (AR 19). The ALJ noted that Mr. Harmon drives, although he gets anxious and nervous, and that he visits with his mother and friends. The ALJ noted that Mr. Harmon helps family and friends with auto repairs and that he does odd jobs for money. Finally, the ALJ found that his "anxiety and depression do not appear very severe or limiting; he remains able to interact with others as needed." (AR 19).

Finally, the ALJ weighed the opinion of Dr. Cristea, as discussed in the previous section. He also discussed the October 2007 state agency reviewing opinion, which concluded that Mr. Harmon retains the physical residual capacity for light work with limited pushing and pulling in the upper extremities, no use of ladders, ropes, or scaffolds, limited reaching in all directions, including reaching overhead, avoidance of hazards such as machinery, heights, etc. due to the history of epilepsy. The ALJ gave this opinion great weight. In formulating the RFC, as discussed in more detail in the next section, the ALJ accommodated all of Mr. Harmon's physical and mental impairments.

Mr. Harmon argues that the ALJ erred because the ALJ did not point to exactly what parts of his allegations of impairments were not credible. In this case, the ALJ's explanation of the factors and the evidence of each was sufficient to support his conclusion that Mr. Harmon was not as limited by his impairments as he claims to be. Like in *Pepper*, the "ALJ could have been more specific as to which physical and mental impairments and symptoms he thought were exaggerated . . . , but that fact does not change the result here." 712 F.3d at 369.

Moreover, the credibility determination was not "patently wrong." Mr. Harmon identified the statements to which he believes the ALJ should have given more credit. Mr. Harmon takes issue with a few of the ALJ's findings, none of which require reversal. First, Mr. Harmon speculates that the ALJ may have discredited him because of a lack of evidence of disc herniation; however, the ALJ did not state that as a basis. Second, although the ALJ noted Mr. Harmon's reason for not taking pain medication because of side effects, Mr. Harmon argues that he did not explain how that affected the credibility determination. It appears that the ALJ's discussion of Mr. Harmon's use of medication did not adversely affect credibility; rather, the ALJ was recognizing that the adverse side effects was the reason for noncompliance, given that he noted that Mr. Harmon otherwise took the medication as prescribed.

Next, Mr. Harmon contests the ALJ's consideration of activities of daily living. He notes that although the ALJ found that he "mows the lawn," he only checked off "lawn work" on the August 23, 2007 disability questionnaire but never testified that he actually does mowing. In the overall balance of factors, the distinction between "mows the lawn" and "lawn work" is minimal. Mr. Harmon challenges the ALJ's statement that he "works on cars." However, he picked "auto repair" as one of two activities he does on a daily or weekly basis to describe in more detail, and he wrote, "Auto repair. I still try to help family & friends save some money if I can." (AR 237). He indicated that it takes him 15-30 minutes to do the repairs. In a different section of the questionnaire, when asked if he does any odd jobs to earn money, he responded, "I'll put my automotive scanner on there[sic] cars, and tell them what's wrong. This takes a few minutes." (AR 238). These responses are not necessarily inconsistent, and the ALJ does not suggest that Mr. Harmon is able to return to his former work as an auto mechanic.

Next, Mr. Harmon contests the ALJ's reliance on the fact that Mr. Harmon goes grocery shopping because when he shops, he leans on the cart and follows his mother while doing it; the fact remains that he does the shopping with a modification. As for pet care, Mr. Harmon does not dispute that he takes care of pets; rather he points to testimony that he does not lift the dog food bag but scoots it across the floor on his foot. He argues that the only "housecleaning" he testified about was "doing the dish washer and stuff" and "switching loads over from the laundry," which he testified about in the context of explaining how he helps out at home since he does not have money to contribute to the household. (AR 37). As for the ALJ's consideration of the fact that he drives, although Mr. Harmon does not drive long distances, he did testify that he drives locally. Mr. Harmon suggests in his brief that "visiting" with his mother takes no effort because he lives with her; however, this fact is significant not for the physical exertion it might take but rather for the fact of the social interaction given Mr. Harmon's social anxiety. Finally, Mr. Harmon argues that the ALJ failed to clarify the ambiguity between the check box on the questionnaire that he spends 1-2 hours a day for "hobbies–internet, music and videos" and his testimony at the hearing that he limits his computer use to bill paying because his neck stiffens when he plays games on the computer; but, the ALJ did not rely on the fact of hobbies in his credibility determination.

The Court finds that substantial evidence supports the ALJ's findings, and the Court will not substitute its judgment for that of the ALJ on the issue of credibility and the weight of the evidence.

## C. Combination of Impairments at Step Three

The issue statement in this section of Mr. Harmon's brief provides: "The ALJ failed to consider the entirety of all of the claimant's impairments which he stated were severe and the effect of them on him as a whole or in combination at step three. Further, the ALJ erred in determining that

the claimant maintained sufficient functional capacity to engage in substantial gainful activity and failed to meets its burden of proof which the Commissioner must prove in step five." Pl. Br., p. 25. Plaintiff is correct that the ALJ must "consider the combined effects of all of the claimant's impairments, even those that would not be considered severe in isolation." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009).

First, Mr. Harmon makes no argument in the narrative portion of his brief as to what listing he would have met at step three had the ALJ considered his severe impairments in combination. Thus, Mr. Harmon has not met his burden of showing that he is disabled at step three.

In his second argument, that the ALJ erred in the RFC determination, Mr. Harmon identifies several impairments that he believes the ALJ did not consider in combination. The Court addresses each in turn, noting at the outset that the ALJ in fact accounted for each impairment in the RFC. First, Mr. Harmon argues that the ALJ ignored the effect of Mr. Harmon's epilepsy on his health, aside from the epilepsy itself, giving two examples. The first is the possibility of future injury given that he sustained an injury to his left shoulder when he had a grand mal seizure in the shower; the evidence of record, however, as recognized by the ALJ, is that Mr. Harmon's grand mal seizures were under control and that he had not suffered one in several years. The second effect he identifies is the osteoporosis that results from the medication he takes to treat his epilepsy, which in turn causes pain in his hips. However, he testified that the hip was "a one or a two, and that's only occasionally." (AR 52).

Next, Mr. Harmon argues that the ALJ ignored the effect that pain impairs Mr. Harmon's ability to move comfortably throughout the day and to get the rest he needs to be productive. He notes that because of his back, neck, shoulder, and hip pain, he needs to shift from standing or

leaning to sitting or reclining frequently to "shift" the pain. The ALJ accounted for his need to change position in the RFC by requiring that he be allowed to "alternate to a sitting or standing position for 1-2 minutes every hour." (AR 15). The RFC also requires that he have no rapid head or neck movement. Given that his credibility determination was supported by substantial evidence, this limitation sufficiently accounts for his need to change position to shift his pain. As for his sleep issues, he notes that he has been diagnosed with chronic fatigue, citing the April 5, 2006 report of Dr. Patel, in which Dr. Patel noted that his chronic fatigue could be multifactorial and for which he ordered a thyroid panel. In subsequent records, Mr. Harmon reported that his fatigue decreased once he began taking thyroid medication. At the hearing, he testified that "a lot of [the fatigue] might have been with the underactive thyroid because, you know, it has gotten a little better taking the medication." (AR 70-71). He also testified that he still was not sleeping well because he is uncomfortable, which he attributed to his need for a new mattress. To the extent Mr. Harmon is fatigued because he compensates for the limited use of his back with other muscle groups, the ALJ accommodated him by the limitation to light work.

Last, Mr. Harmon notes that the Raynaud's disease, or cold intolerance, exacerbates his back, neck, and left shoulder pain. Again, the ALJ accounted for the Raynaud's disease by including a limitation in the RFC to no work at extremes of temperature or humidity.

Mr. Harmon has not identified any error by the ALJ in considering the combination of his impairments, and remand is not warranted on this ground.

### D. Hypothetical Questions

Mr. Harmon argues that the ALJ failed to pose an adequate hypothetical to the vocational expert because the hypothetical did not include all limitations supported by medical evidence in the

record. The Court disagrees. "When an ALJ poses a hypothetical question to a vocational expert, the question must include all limitations supported by medical evidence in the record." *Stewart v. AStrue*, 561 F.3d 679, 684 (7th Cir. 2009). The hypothetical question posed to the VE included all of the limitations in the RFC, and the RFC accounted for Mr. Harmon's alleged limitations consistent with the ALJ's credibility determination and the weight he gave to the physicians of record.

The ALJ's hypothetical question included limitations relating to: Mr. Harmon's social difficulties (only superficial contact with others); Mr. Harmon's left shoulder impairment (light lifting and no overhead reaching); Mr. Harmon's history of seizure activity (no driving, no heights or dangerous machinery, and no exposure to open flames or bodies of water); Mr. Harmon's difficulty with prolonged sitting and standing (allowed to alternate positions for a few minutes every hour); Mr. Harmon's complaint that cold made his hands stiffen (no extreme temperatures); and Mr. Harmon's neck pain and limited motion (no rapid head movement). The VE testified that Mr. Harmon could perform approximately 26,000 jobs in Indiana.

None of the specific evidence identified by Mr. Harmon shows that he is more limited than found by the ALJ in the RFC. First, several of Mr. Harmon's arguments are a repetition of the issues addressed in the previous section as to the formulation of the RFC, namely his Reynaud's disease, changing position to shift weight, and chronic fatigue. Because the ALJ sufficiently accounted for these impairments in the RFC and because the ALJ included the limitations of the RFC in the hypothetical, there is no error. Similarly, in the hypothetical, the ALJ properly accounted for other limitations cited by Mr. Harmon in light of the credibility determination and the weight given to the physicians of record; this evidence is his need to change position every 15 to 20 minutes or to revert

to a reclining position when seated; his testimony that he has dropped a gallon of milk; pain and heaviness in his feet; and his social anxiety. The ALJ did not err in posing the hypothetical to the VE.

## CONCLUSION

Based on the foregoing, the Court hereby **DENIES** the relief sought in Plaintiff's Brief [DE 23] and **AFFIRMS** the Commissioner of Social Security's final decision.

So ORDERED this 26th day of September, 2013.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record